IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION



BRYNN BEAL,

    Plaintiff

v.                                                      CIVIL NO. 4:12cv184

LILLY USA, LLC,

    Defendant.

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Brynn Beal ("Plaintiff") alleges that, in terminating her employment, Lilly USA, LLC ("Lilly" or "Defendant") took retaliatory action against her motivated by Plaintiff lodging a complaint with Lilly's Human Resources ("HR") Department concerning the actions of Plaintiff's immediate supervisor. Lilly, on the other hand, argues that Plaintiff was dismissed approximately eleven months after that complaint was lodged when she admitted to falsifying sales-call records. The matter is currently before the Court upon Defendant's Motion for Summary Judgment. ECF No. 20. For the reasons set forth herein, the Court: (1) **GRANTS** Defendant's Motion for Summary Judgment, ECF No. 20; and (2) **DENIES** as **MOOT** Defendant's Motion In Limine, ECF No. 25.

### CONTENTS

I.    FACTUAL BACKGROUND ................................................................................ 2
    A.    PLAINTIFF'S PERFORMANCE REVIEWS IN 2008 AND 2009 .................................. 2
    B.    PLAINTIFF'S 2009 MERIT-BASED INCOME INCREASE AND HER COMPLAINT AGAINST FUTRELL ............................................................. 5
    C.    PLAINTIFF'S PERFORMANCE REVIEW IN 2010 .................................................... 8

1

      D.    DR. BUSHEY'S LETTER ACCUSING PLAINTIFF OF IMPATIENT AND AGGRESSIVE BEHAVIOR TOWARD HEALTHCARE PROVIDER STAFF ..................9

      E.    LILLY'S INVESTIGATION AND TERMINATION OF PLAINTIFF FOR FALSIFICATION OF SALES CALL RECORDS ......................................................11

II.    PROCEDURAL HISTORY..............................................................................16

III.   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ........................17

      A.    STANDARD OF REVIEW.................................................................................17

      B.    PLAINTIFF FAILS TO ESTABLISH A PRIMA FACIE CASE OF RETALIATION .........18

IV.   DEFENDANT'S MOTION IN LIMINE IS DENIED AS MOOT .......................19

V.    CONCLUSION .................................................................................................19

## I. FACTUAL BACKGROUND

Lilly is a global, research-based pharmaceutical company. Plaintiff was employed by Lilly from March 2008 to November 2010. Throughout that time, Plaintiff served as a Pharmaceutical Sales Representative in the Richmond Neuroscience District. Her immediate supervisor was John W. Futrell ("Futrell"). As a Pharmaceutical Sales Representative, Plaintiff was responsible for visiting physician offices in the area of Newport News, Virginia and promoting the use, benefits, and prescription of Lilly pharmaceutics, including: (1) Cymbalta; (2) Strattera; (3) Zyprexa; and (4) Cialis. Def.'s Mem. in Supp. of Mot. for Summ. J. 2, ECF No. 20 (facts set forth in ¶ 2); Pl.'s Mem. in Opp. of Def.'s Mot. for Summ. J. 1, ECF No. 22 (stating Plaintiff agrees with facts set forth in ¶ 2 of Defendant's Memorandum).

### A. PLAINTIFF'S PERFORMANCE REVIEWS IN 2008 AND 2009

During the course of her employment, Plaintiff was subject to yearly performance evaluations by her supervisor, Futrell. Pl.'s Mem. in Opp. of Def.'s Mot. for Summ. J., Ex. A, at ¶ 10, ECF No. 22. Plaintiff has supplied her reviews for 2008, 2009, and 2010. Pl.'s Mem. in Opp. of Def.'s Mot. for Summ. J., Ex. A-1, ECF No. 22. The reviews do not set forth the specific date on which they were completed or transmitted to Plaintiff, but they do indicate the

relevant year in the upper-right hand corner of the first page. See e.g., Pl.'s Mem. in Opp. of Def.'s Mot. for Summ. J., Ex. A-1, at 1, ECF No. 22 (indicating yearly performance review for "2008"). Amongst other things, a stated objective of the Richmond Neuroscience District was for all Pharmaceutical Sales Representatives to deliver "[t]op third sales performance for portfolio and top half for all promoted products." Beal Dep. 69:14-69:22, ECF No. 20-4.

The first of Plaintiff's yearly performance reviews available to the Court is for 2008. As Plaintiff was hired in March 2008, the review is necessarily limited to the months for which Plaintiff was employed with Lilly. Plaintiff's 2008 review was generally positive in tone, but identified a number of things that were "not completed or could have been done differently." Pl.'s Mem. in Opp. of Def.'s Mot. for Summ. J., Ex. A-1, at 1, ECF No. 22. For instance, Futrell expressed concern about Plaintiff having "bottom sales performance for Newport News . . . on the portfolio 324/518 (62% [i.e., Plaintiff was in the lowest 38%]), Cymbalta 474/518 (91% [i.e., Plaintiff was in the lowest 9%]), and Strattera 380/518 (73% [i.e., Plaintiff was in the lowest 27%])." This indicates that, in 2008, 62% of the 518 employees rated out-performed Plaintiff on their total pharmaceutics portfolios, whereas 91% outperformed Plaintiff with respect to Cymbalta and 73% outperformed Plaintiff with respect to Strattera. Amongst other things, Plaintiff was asked to "becom[e] more consistent with [her] calls per day." Futrell concluded he "truly believed" that they Plaintiff and her sales territory partner, Kate Gormley ("Gormley"), could "have a great 2009!" Pl.'s Mem. in Opp. of Def.'s Mot. for Summ. J., Ex. A-1, at 1, ECF No. 22.

Following the written portion of the "performance summary" appears a table where Futrell provides Plaintiff with ratings in various "leadership behaviors," including: (1) demonstrating through daily conduct Lilly values, with specific mention of "people,

3

integrity, and excellence"; (2) creating external focus; (3) anticipating changes and preparing for the future; (4) making decisions and executing would plans to achieve results; (5) evaluating results and adjusting course as needed; (6) enabling and energizing yourself, others, and the organization to deliver results; and (7) seeking and sharing knowledge, and applying what you have learned from successes and failure. In 2008, Futrell rated Plaintiff "[s]ucessful" in each of the aforementioned categories. Pl.'s Mem. in Opp. of Def.'s Mot. for Summ. J., Ex. A-1, at 1-2, ECF No. 22. In 2008, a supervisor would rate the employee's behavior in the aforementioned categories, from best to worst, as: (1) outstanding; (2) successful; (3) needs improvement; or (4) unsatisfactory. The review further concluded, via a check-box, that based on her performance Plaintiff would be eligible to be considered for a merit-based income increase. Pl.'s Mem. in Opp. of Def.'s Mot. for Summ. J., Ex. A-1, at 1, ECF No. 22.

In 2009, Futrell again conducted Plaintiff's performance review, noting improvement in, amongst other things, call-per-day frequency. He also stated that Plaintiff had a top-40% sales performance with respect to Strattera. However, Futrell again noted that Plaintiff had underperformed with respect to a number of other pharmaceutics, specifically pointing to her "performance with Cymbalta (92% to Rank—450/488 [i.e., Plaintiff was in the lowest 8%]), [and] [p]erformance with Zyprexa (93% to Rank—452/488 [i.e., Plaintiff was in the lowest 7%])." Futrell also encouraged Plaintiff to engage in "more consistent quality face to face interactions." He further stated that, had Plaintiff and Gromley not underperformed, "the Newport News territory would not have finished in the bottom 1/3rd percent." Futrell offered a series of recommendations and concluded by stating that "I [Futrell] look forward to watching you develop in these areas in 2010." Pl.'s Mem. in Opp. of Def.'s Mot. for Summ. J., Ex. A-1, at 3, ECF No. 22.

As in 2008, the 2009 performance review sheet set forth a series of "performance behaviors" for which the employee would receive a ranking. In 2009, a supervisor would rate the employee's behavior in those categories, from best to worst, as: (1) exemplary; (2) high successful; (3) successful; (4) low successful; and (5) unsatisfactory. Plaintiff received rankings of "successful" with respect to engagement, teamwork, and demonstration of Lilly values. However, Plaintiff received "low successful" rankings in the categories of accountability and action. The review further concluded, via a check-box that based on her performance, which in 2009 expressly "includes adherence to ethics and compliance requirements," Plaintiff would be eligible to be considered for a merit-based income increase. Pl.'s Mem. in Opp. of Def.'s Mot. for Summ. J., Ex. A-1, at 4, ECF No. 22.

### B. PLAINTIFF'S 2009 MERIT-BASED INCOME INCREASE AND HER COMPLAINT AGAINST FUTRELL

Notwithstanding Futrell indicating that Plaintiff was *eligible* for a merit-based income increase based on her 2009 performance review, *see* Pl.'s Mem. in Opp. of Def.'s Mot. for Summ. J., Ex. A-1, at 4, ECF No. 22, Plaintiff alleges that she later learned from Futrell, in December 2009, that no merit-based income increase would be awarded, *see* Beal Dep. 76:13-77:24, ECF No. 20-4. Plaintiff does not recall when or where this conversation took place, but alleges that Futrell explained she was not awarded the merit-based income increase due to her poor territory performance. Beal Dep. 77:9-77:12, ECF No. 20-4 ("[H]e told me that it's . . . based on territory performance. We hadn't yet grown to the potential the territory had.").

However, the performance evaluations furnished by Plaintiff, as well her deposition testimony, evidence that Lilly's Pharmaceutical Sales Representatives were being evaluated on both sales performance and behavior. Beal Dep. 80:10-80:13, ECF No. 20-4 (Plaintiff acknowledging that she was "being evaluated both on sales results and on behaviors of

5

competencies" during her employment with Lilly); Pl.'s Mem. in Opp. of Def.'s Mot. for Summ. J., Ex. A-1, ECF No. 22. For instance, in 2009, Plaintiff had received rankings of "low successful" in the categories of: (1) accountability, which concerns responsibility for words and actions; and (2) action, which concerns deciding and acting promptly, and using good judgment. Pl.'s Mem. in Opp. of Def.'s Mot. for Summ. J., Ex. A-1, at 4, ECF No. 22; see also Beal Dep. 81:9-81:12, ECF No. 20-4 (Plaintiff not disputing the fact that "for purposes of a merit pay increase Lilly evaluated . . . [her] based on both behaviors and sales results").

According to Plaintiff, she left that initial conversation with Futrell, in which she learned that she would not receive the merit-based income increase, "feeling a little defeated; but thinking, I'll grow my territory even more next year." Beal Dep. 77:15-77:17, ECF No. 20-4. Sometime thereafter, in December 2009, Plaintiff alleges that she learned that another Sales Representative responsible for the Newport News, VA area, Kate Gromley ("Gromley"), had been awarded a merit-based income increase for 2009. Beal Dep. 73:18-74:6, 77:25-78:6, ECF No. 20-4. Upon learning that Gromley had been awarded a merit-based pay increase, whereas she had not, Plaintiff confronted Futrell via a telephone call. Though Plaintiff was fully aware that she was being assessed both on sales results and behavior throughout her employment at Lilly, Beal Dep. 80:10-80:13, 81:9-81:12, ECF No. 20-4, she alleges that Futrell had led her to believe she was being assessed purely on sales results. Thus, Plaintiff questioned Futrell as to why Gromley, who also worked the Newport News area, was awarded a merit-based pay increase whereas she was not. Beal Dep. 73:19-73:24, ECF No. 20-4.

According to Plaintiff, Futrell responded by stating that he would not discuss another employee's merit-based income increase, and that Gromley's increase was irrelevant to the conversation. Beal Dep. 73:25-74:2, ECF No. 20-4. Not satisfied with that response, Plaintiff

6

persisted in questioning Futrell as to why Gromley had received an increase, whereas she had not, if the increase was awarded based on territory performance. Beal Dep. 74:2-74:6, ECF No. 20-4. Plaintiff alleges that Futrell then told her she should focus on growing her territory and "watching [her] fat mouth." Beal Dep. 73:23-73:25, ECF No. 20-4. Plaintiff inquired as to what Futrell meant in terms of her "fat mouth," and Futrell allegedly conveyed an example from a conference in October 2009. Beal Dep. 75:7-75:13, 78:13-80:5, ECF No. 20-4.

The example allegedly offered by Futrell concerned a conference held in Charlotte in October 2009. Plaintiff alleges that she was asked to make a presentation at that conference to boost morale due to impending "realignment" at Lilly. Plaintiff began the presentation "by sating [that] the reason for this presentation is because of the impending layoffs." Futrell allegedly interjected before the group and stated: "They're not layoffs. They're—it's a realignment." Beal Dep. 79:1-79:11, ECF No. 20-4. Though Plaintiff stated during her deposition that she does not remember her exact words, she allegedly responded by asking Futrell, before the group, as to why he was so hard on her, or alternatively why he was always teasing her. Beal Dep. 79:12-79:14, ECF No. 20-4. It was this example that Futrell allegedly provided during his second conversation with Beal concerning her 2009 merit-based income increase, and Plaintiff understood that this example was offered as an instance where Plaintiff "talked back to [Futrell] in front of [Plaintiff's] group of peers." Beal Dep. 79:15-79:24, ECF No. 20-4.

Plaintiff stated during her deposition that she felt this second conversation with Futrell concerning her 2009 merit-based income increase "did not go well," Beal Dep. 74:7, ECF No. 20-4, and she was allegedly crying so hard afterward that she had to stop and pull her car over, Beal Dep. 88:15-88:16, ECF No. 20-4. After hanging up with Futrell, Plaintiff immediately

contacted Lilly's HR Department. Beal Dep. 88:6-88:19, ECF No. 20-4. Plaintiff does not know who she spoke to in HR, but recalls that she stated that she wanted to report Futrell "for continued intimidation and bullying." Beal Dep. 88:17-88:18, ECF No. 20-4. Plaintiff states that the call was placed as Lilly was "getting ready to go into Christmas break," and the unidentified HR representative she spoke to allegedly said that "somebody would be in touch . . . after the holidays." Beal Dep. 88:19-88:24, ECF No. 20-4. In January 2010, Plaintiff spoke with Lori Morris ("Morris"), who served as a Human Resources Representative in Lilly's Global Investigations Group from March 2007 to June 2013, about her complaint. Beal Dep.88:25-89:17, ECF No. 20-4; see also Morris Aff. ¶ 13, ECF No. 20-3. About one month after that conversation, Plaintiff alleges that Morris left a voicemail for Plaintiff to check-in and see how Plaintiff was doing. Plaintiff, however, did not follow-up with Morris, stating that she "was scared to call [Morris] back." Plaintiff offers no explanation as to why she feared doing so. Beal Dep. 89:18-89:23, ECF No. 20-4. During her deposition, Plaintiff stated that no other situations arose where she reached out to Lilly's HR Department. Beal Dep. 123:14-123:17, ECF No. 20-4.

### C. PLAINTIFF'S PERFORMANCE REVIEW IN 2010

Plaintiff's employment with Lilly for the remainder of 2010 appears to have been uneventful until November 2010. As in previous years, Futrell conducted Plaintiff's performance review, which Plaintiff has supplied to the Court. In terms of positives, Futrell noted that Plaintiff was able to deliver a top-10% performance with respect to Symbyax. He concluded his positive remarks by stating that Plaintiff "has delivered her results in a way that is consistent with company policies and processes." However, with respect to shortcomings, Futrell noted that Plaintiff had underperformed for the third year in a row with respect to certain Lilly pharmaceutics. For instance, in terms of portfolio performance, Plaintiff had a year-to-date

8

rank of "758/936—81% to Rank [i.e., Plaintiff was in the lowest 19%]." He also noted that, with respect to Cymbalta, Plaintiff had a year-to-date "Rank of 700/936—75% to Rank [i.e., Plaintiff was in the lowest 25%]" and, as for Strattera, a year-to-date "Rank of 849/936—91% to Rank [i.e., Plaintiff was in the lowest 9%]." Thus, once again, Plaintiff was performing in the lower quarter of ranked Lilly employees on her portfolio, and as low as the bottom-10% with respect to one of the pharmaceutics for which she was responsible. Nonetheless, Futrell concluded the review by thanking Plaintiff for her contributions "thus far in 2010" and stating that he "look[ed] forward to watching [Plaintiff] develop . . . and turning Cymbalta and Straterra positive in the second half of the year!" Pl.'s Mem. in Opp. of Def.'s Mot. for Summ. J., Ex. A-1, at 5, ECF No. 22.

In 2010, the categories and rankings set forth on the form were unchanged from those in 2009. Plaintiff received rankings of "successful" in all categories, except "action," which involves use of good judgment, for which she was again ranked "low successful." The form further provided the check-boxes indicating whether the employee was, or was not, eligible for a merit-based income increase. Neither box was checked on the form supplied to the Court by Plaintiff. Pl.'s Mem. in Opp. of Def.'s Mot. for Summ. J., Ex. A-1, at 6, ECF No. 22.

### D. DR. BUSHEY'S LETTER ACCUSING PLAINTIFF OF IMPATIENT AND AGGRESSIVE BEHAVIOR TOWARD HEALTHCARE PROVIDER STAFF

On October 27, 2010, Plaintiff visited the office of the Tidewater Physicians Multispecialty Group in Newport News, Virginia as part of her employment with Lilly. On October 28, 2010, the Managing Physician of that practice, Sarah M. Bushey, M.D. ("Dr. Bushey"), sent a letter to Lilly's Corporate Center in Indianapolis, Indiana. The letter provides:

> On October 27, 2010 Ms. Brynn Beal presented to our office for physician signatures for samples. It is our policy; since our first duty is to our patients, that the physician not be pulled from an exam room and will sign required forms after

> he or she has finished with a patient. Some visits are brief and others more comprehensive. We make no guarantees about waiting time.
>
> Ms. Beal was extremely impatient in our waiting room and very aggressive with our front staff. Our patients come first and we would ask that behavior always be gracious and unobtrusive. Should this occur again, we would respectfully request that this representative not come to our office.

Beal Dep. Ex. 11, ECF No. 20-5. The letter is dated October 28, 2010, set forth on the practice's letterhead, and signed by Dr. Bushey.

Lilly's corporate headquarters transmitted the letter to Futrell, who confronted Plaintiff concerning its contents about two weeks prior to her termination. Beal Dep. 128:7-128:22, ECF No. 20-4. Futrell asked Plaintiff "what happened." Plaintiff, who claims that she was "blind[-]sided," explained her version of the events, stated that the "letter is inaccurate," and took issue with "how Dr. Bushey could attest to [her] impatience and supposed aggression" because she had not seen Dr. Bushey on October 27, 2010. Beal Dep. 129:2-129:17, ECF No 20-4. According to Plaintiff, she and another pharmaceutical representative from another company were awaiting a signature from one of the practice's doctors. Plaintiff and the other representative allegedly waited for one hour, at which time the front desk staff began turning the office's lights off for lunch, apparently having forgotten that they were there. Plaintiff and the representative approached the staff and allegedly asked if they could get their documents signed, because they "had a lunch . . . [a]nd it was not the first time that [they] had asked in that hour." A Dr. Irving approached and tried to sign the documents, but because Dr. Irving was not in Lilly's computer, Plaintiff and the other representative found that unacceptable. Thus, Plaintiff alleges "it was even a longer wait for another physician." Plaintiff stated that the other representative then approached the front desk staff and complained about the wait and the front office staff's conduct. Beal Dep. 130:1-130:16, ECF No. 20-4.

Notwithstanding Plaintiff's explanation of the events, Futrell asked Plaintiff to return to Dr. Bushey's office and apologize to the front office staff. Beal Dep. 131:18-131:22, ECF No. 20-4. Plaintiff complied with Futrell's request. Plaintiff alleges that she went to the office "very tearful and very sorry" and apologized to the Office Manager. Beal Dep. 132:17-133:5, ECF No. 20-4. Plaintiff then followed-up with Futrell to "let him know that [she] had apologized to the office manager and that [her] apology would be related to Dr. Bushey and that [Plaintiff] felt like [she] had done everything that [Futrell] had asked [her] to do. And again, that [she] was sorry." Beal Dep. 133:23-134:5, ECF No. 20-4.

### E. LILLY'S INVESTIGATION AND TERMINATION OF PLAINTIFF FOR FALSIFICATION OF SALES CALL RECORDS

Aside from requesting that Plaintiff apologize to Dr. Bushey's staff, Futrell initiated an investigation to determine whether Plaintiff had falsified sales call records. This was based on Plaintiff's insistence, during their first conversation, that Dr. Bushey could not "attest to [Plaintiff's] impatience and supposed aggression," because she did not see Dr. Bushey on October 27, 2010. Beal Dep. 129:2-129:17, 131:8-131:12, ECF No 20-4. That claim was inconsistent with Plaintiff's sales call record, in which Plaintiff had entered that she had completed a "detail and samples" call—i.e., had engaged in a face-to-face interaction—with respect to Dr. Bushey on October 27, 2010.

Throughout the term of Plaintiff's employment, Lilly's Pharmaceutical Sales Representatives were expected to document each visit to a doctor's office. This was done in the Richmond Neuroscience District through a computer program entitled Premier Force. Beal Dep. 38:14-38:25, ECF No. 20-4. Plaintiff acknowledged that, during her employment with Lilly, there were some call types for which she would receive credit and others for which no credit was given. Beal Dep. 40:3-40:9, ECF No. 20-4 (Plaintiff stating "I remember that there were certain

11

types [of calls] that gave us credit versus other call types that did not, yes"). Plaintiff further acknowledged that, during her employment, she understood it was important to adhere to all of Lilly's company policies, Beal Dep. 63:12-63:19, ECF No. 20-4, and that she was expected to document her activities accurately, Beal Dep. 189:11-189:13, ECF No. 20-4.

Plaintiff could not, however, recall why she logged calls to Dr. Bushey's office as "detail and samples," or how Lilly defined certain types of calls during the course of her employment. Beal Dep. 38:5-40:2, ECF No. 20-4 (Plaintiff acknowledging that Lilly defined various types of calls, and required associates to log their sales call in software entitled "Premier Force," but stating she would be speculating as to her "understanding of what could be recorded as a sales call" because it had been too long); Beal Dep. 49:6-49:17, ECF No. 20-4 (stating she has no recollection as to how various types of calls were defined, or how she determined what designation to assign to each call); Beal Dep. 136:15-137:7, ECF No. 20-4 (Plaintiff failing to recall whether she had "any particular rules as to" how she determined whether or not to record a call as "detail and sample").

Lori S. Morris ("Morris"), who served as a Human Resources Representative in Lilly's Global Investigations Group during the duration of Plaintiff's employment, attests that "[a]t all times during Plaintiff['s] . . . employment, Lilly maintained a policy on Documenting a Sales Call." Morris Aff. 2, ECF No. 20-3. At her deposition, Defendant's counsel questioned Plaintiff concerning iterations of this policy that were in effect at all times pertinent to Plaintiff's employment. Beal Dep. Ex. 1, ECF No 1 (effective date August 23, 2007); Beal Dep. Ex. 2, ECF No 2 (effective date August 23, 2007, revision date June 1, 2008); Beal Dep. Ex. 3, ECF No 3 (effective date January 1, 2009); Beal Dep. Ex. 4, ECF No 4 (effective date May 18, 2010). The definition of a "sales call" remained relatively static throughout this period.

For instance, the "US Policy on Documenting a Sales Call" effective beginning on May 18, 2010, provides:

> A sales call is a face-to-face interaction that meets both of the following criteria:
>
> - Is between a Lilly sales representative and an appropriate [Health Care Provider] customer (i.e., a licensed prescriber meeting brand-approved territory-to-physician (TIP) rules or a non-prescribing [Health Care Provider] who is involved in patient care, as designated by local leadership).
>
> - Includes a dialogue involving one or more of the following approved topics: Lilly product(s), associated solutions, appropriate brand patient(s), appropriate disease state(s).

Beal Dep. Ex. 4, at 1, ECF No. 20-5. The Policy further provides:

> The following activities are not considered a sales call:
>
> - Dropping off promotional material and/or Lilly samples without having a discussion with an appropriate [Health Care Provider] customer.
>
> - Speaking only with an individual who is not an appropriate [Health Care Provider] customer.
>
> - Phone call with an appropriate [Health Care Provider] customer.
>
> - Social or personal interaction with an appropriate [Health Care Provider] customer.
>
> - Written correspondence with an appropriate [Health Care Provider] customer.

Beal Dep. Ex. 4, at 1, ECF No. 20-5. "For each sales call, the sales representative must accurately document the interaction in an approved sales call recording system . . . approved by the appropriate business unit." Beal Dep. Ex. 4, at 2, ECF No. 20-5.

Based on Futrell's investigation into Plaintiff's sales-call history, Plaintiff was asked to meet at a local hotel or about Monday, November 15, 2010. Beal Dep. 141:22-142:3, ECF No. 20-4. Plaintiff and Futrell were physically present at the meeting, and Morris participated via conference call. During her deposition, Plaintiff was presented with a transcript of that meeting.

<u>See</u> Beal Dep. Ex. 12, ECF No. 20-5. Plaintiff acknowledged that she was aware the meeting was being recorded, and stated that "everything I [Plaintiff] said in that meeting is honest." Beal Dep. 143:14-143:25, ECF No. 20-4. Plaintiff acknowledged all portions of the transcript reviewed during her deposition, which was the vast majority of it, is an accurate representation of that day's exchange between Plaintiff, Futrell, and Morris. Beal Dep. 156:14-156:20, ECF No. 20-4.

The transcript from the meeting is dated November 17, 2010 and is entitled "Interview Guide for conversation with Brynn Beal, Sales Representative." The header states that the conversation was "[l]ed by John Futrell, District Sales Manager," with "Lori Morris—HR-Global Investigations" on the phone. Beal Dep. Ex. 12, at 1, ECF No. 20-5. After a short introduction, Futrell requested that Plaintiff bring up her sales-call history for October 27, 2010 in the Premier Force software. Futrell then inquired about his first conversation with Plaintiff concerning Dr. Bushey's letter complaining of Plaintiff's conduct on October 27, 2010. Plaintiff acknowledged that, during the course of that conversation, she said "this is bullshit and entirely unfair, started to cry and got upset." Beal Dep. Ex. 12, at 3, ECF No. 20-5. When asked what Dr. Bushey had said to Plaintiff on October 27, 2010, Plaintiff stated: "Dr. Bushey wasn't even up front and wasn't even there. She never saw me [Plaintiff]; never spoke to me. She signed my paper in the back and sent it up front. I never spoke with her." Beal Dep. Ex. 12, at 3, ECF No. 20-5; <u>see also</u> Beal Dep. Ex. 12, at 4, ECF No. 20-5 ("I didn't even see her [Dr. Bushey]. Not at all on that day."). Futrell then asked that Plaintiff explain how she "entered a detail sample call when [she] stated twice and it was confirmed that Dr. Bushey did not see [Plaintiff] on that day." Plaintiff simply acknowledged that Futrell's description was accurate.

Futrell then inquired as to another sales call that Plaintiff recorded on October 27, 2010 with respect to a "Dr. Banning." Futrell asked Plaintiff to explain how she "entered a detail only call on Dr[.] Banning" notwithstanding the fact that she had told him, and it was confirmed, that she could "only see [Dr. Banning] at lunch and learns?" Plaintiff acknowledged that she had "sent Dr. Banning's card back as well" and had, in fact, not seen him on October 27, 2010. Beal Dep. Ex. 12, at 4, ECF No. 20-5.

The conversation then turned to October 19, 2010, and Futrell requested that Plaintiff walk him through another entry concerning Dr. Banning. Plaintiff responded that she "didn't get any time with Banning" on October 19, 2010, but rather "left information for the staff and asked them to put the information into their mailbox." Plaintiff further acknowledged that such conduct "is not unique to me where you can only have a lunch in the office every 6 months," and explained that she did so because she "needed to make frequency," meaning satisfaction of Lilly sales-call expectations. Beal Dep. Ex. 12, at 4, ECF No. 20-5.

Futrell then stated: "Bryn, you placed multiple detail only calls for Dr Banning over the course of 9 months. Specifically, you entered over 40 calls on Dr Banning from January through Oct. No lunches but multiple calls entered. Please explain." In response, Plaintiff stated: "I can't explain it. In my mind, that's what constitutes a detail. That is the only way you can. As of Jan 2011, they have opted out of lunches and only take samples. That is the only way you can provide value to this office." Beal Dep. Ex. 12, at 5, ECF No. 20-5.

Plaintiff was later asked to describe her "understanding of the US Policy on Documenting a Sales Call—specifically the definition of a sales call." Plaintiff stated "I don't know, it is a face to face interaction with a product. I heard that before in some guidelines and some ITPs that I have done." Beal Dep. Ex. 12, at 7, ECF No. 20-5. Thus, at the time of this meeting, Plaintiff

15

acknowledged that Lilly defined a sales call as a face-to-face interaction concerning Lilly pharmaceutics, and she had been exposed to that definition during the course of her employment. Plaintiff was further asked to explain her "understanding of the different types of calls to choose from when documenting an interaction in Premier Force." Plaintiff stated that she had "always used detail only, detail sample, [or] lunch n learn," for which Lilly sales representatives received credit, but had never use "information only" or "sample only," for which no credit was given. Beal Dep. Ex. 12, at 7, ECF No. 20-5.

After questioning Plaintiff concerning her sales-call history, Futrell left the room for a period of time. Beal Dep. 153:22-153:23, ECF No. 20-4. Upon returning, Futrell stated: "Based on the findings we have concluded that you falsified call reports. Based on this information you are being separated from Eli Lilly and Company for professional misconduct and falsification of documents." Beal Dep. Ex. 12, at 8, ECF No. 20-5.

## II. PROCEDURAL HISTORY

On April 30, 2012, Plaintiff filed her Complaint in the Circuit Court for the City of Newport News, VA. ECF No. 1-1. Defendant Lilly filed a Notice of Removal in this Court on December 17, 2012. ECF No. 1. On January 7, 2013, Defendant filed an Answer, ECF No. 6, to Plaintiff's Complaint, ECF No. 1-1.

On August 2, 2013, Defendant filed the instant Motion for Summary Judgment, ECF No. 19, as well as a Memorandum in Support thereof, ECF No. 20. On August 16, 2013, Plaintiff filed a Memorandum in Opposition, ECF No. 22, to Defendant's Motion for Summary Judgment, ECF No. 19. On August 22, 2013, Defendant filed a Reply, ECF No. 23, to Plaintiff's Response, ECF No. 22.

On August 30, 2013, Defendant filed a Motion In Limine requesting that the Court enter an order excluding certain evidence, testimony, and questions at trial. ECF No. 25. Trial in this

matter is currently scheduled to commence on Tuesday, October 8, 2013. See Rule 16(b) Scheduling Ord., ECF No. 11.

### III. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

#### A. STANDARD OF REVIEW

Defendant moves for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. In consideration of a motion for summary judgment, a court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405 (4th Cir. 2005). Summary judgment will, however, "be granted unless 'a reasonable jury could return a verdict for the nonmoving party' on the evidence presented." Kelley v. United Parcel Service, Inc., No. 12-2343, 2013 WL 2480211, at *1 (4th Cir. June 11, 2013) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the nonmoving party's] case." Id. (quoting Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002)).

Plaintiff's claim that she was retaliated against for engaging in protected activity under Title VII is to be analyzed under the shifting burdens framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), and its progeny, see Hux v. City of Newport News, Va., 451 F.3d 311, 314 (4th Cir. 2006) (citing Hawkins v. PepsiCo, Inc., 203 F.3d 274, 278 4th Cir. 2000)). Under that framework, a plaintiff employee must first establish a prima facie case of retaliation by showing that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal nexus between the protected activity and adverse action. Brockman v. Snow, 217 Fed. Appx. 201, 206 (4th Cir. 2007) (citing McNairn v. Sullivan, 929 F.2d 974, 980 4th Cir. 1991)).

However, as explained by the Supreme Court in Nassar, "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2528 (2013) (citing Gross v. FBL Financial Services, Inc., 557 U.S. 167, 176 (2009)). If the prima facie case is made, the burden shifts to the employer "to demonstrate a legitimate non-discriminatory reason for the adverse employment action." Brockman, 217 Fed. Appx. at 205 (citing Hux, 451 F.3d at 314). If the employer provides a legitimate non-discriminatory reason, the burden shifts back to the plaintiff employee to "prove that this reason was actually a pretext for" retaliation. Id. (citing Hux, 451 F.3d at 315).

### B. PLAINTIFF FAILS TO ESTABLISH A PRIMA FACIE CASE OF RETALIATION

The Court will not engage in a lengthy recitation of the facts set forth in Part I of this Opinion and Order. It is evident from Plaintiff's deposition, as well as the documents submitted to the Court, that Lilly maintained a policy concerning the recordation of sales calls by Pharmaceutical Sales Representatives throughout the term of Plaintiff's employment. Plaintiff was aware of such a policy, and had been exposed to the definition of a sales call prior to her termination. See Beal Dep. Ex. 12, at 7, ECF No. 20-5. Plaintiff understood that it was important to adhere to all of Lilly's company policies, Beal Dep. 63:12-63:19, ECF No. 20-4, and that she was expected to document her activities accurately, Beal Dep. 189:11-189:13, ECF No. 20-4.

Notwithstanding Lilly's sales call policy, Plaintiff regularly logged her activities using designations which indicated that she had face-to-face interactions with healthcare professionals when, in fact, no such interaction had occurred. See Beal Dep. 142:1-156:20, ECF No. 20-4 (Plaintiff reviewing transcript of termination meeting and acknowledging accuracy of statements which evidence she falsified sales-call records); Beal Dep. Ex. 12, ECF No. 20-5 (transcript of

18

conference call where Plaintiff acknowledges that she logged sales call in a manner indicating face-to-face interaction to meet sales call quotas—i.e., "frequency"—notwithstanding the fact those face-to-face interactions never occurred). All the evidence indicates that this was the basis for Plaintiff's termination.

In light of Plaintiff acknowledging the falsification of call records during the course of her employment with Lilly, no reasonable juror could find that retaliatory motive was the but-for cause of her termination. Accordingly, the Court **FINDS** that Plaintiff fails to marshal sufficient evidence from which a reasonable jury could find that retaliation was the but-for cause of her termination, and as a result further **FINDS** that Plaintiff fails to establish a prima facie case of retaliation. The Court, therefore, **GRANTS** Defendant's Motion for Summary Judgment. ECF No. 20.

## IV. DEFENDANT'S MOTION IN LIMINE IS DENIED AS MOOT

On August 30, 2013, Defendant filed a Motion In Limine requesting that the Court enter an order excluding certain evidence, testimony, and questions at trial. ECF No. 25. However, as set forth in Part III of this Opinion and Order, the Court has granted Defendant's Motion for Summary Judgment. ECF No. 20. The Court, therefore, **DENIES** Defendant's Motion In Limine as **MOOT**. ECF No. 25.

## V. CONCLUSION

For the reasons set forth herein, the Court: (1) **GRANTS** Defendant's Motion for Summary Judgment, ECF No. 20; and (2) **DENIES** as **MOOT** Defendant's Motion In Limine, ECF No. 25. The Clerk is **DIRECTED** to forward a copy of this Order to all Counsel of Record.

IT IS SO ORDERED.

/s/
Robert G. Doumar
Senior United States District Judge

_____
UNITED STATES DISTRICT JUDGE

Norfolk, VA
September 24, 2013